THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RICKY W. MORRISON, Defendant-Appellant.

Fourth District   No. 4—88—0309

Opinion filed December 30, 1988.

Andrew C. Schnack III, of Quincy, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a jury trial, defendant Ricky Morrison was convicted of unlawful possession of more than 15 grams of a substance containing cocaine, in violation of section 402(a)(2) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1987, ch. 56½, par. 1402(a)(2)), and of unlawful possession of more than 30 grams but less than 500 grams of a

substance containing cannabis, in violation of section 4(d) of the Cannabis Control Act (Ill. Rev. Stat. 1987, ch. 56½, par. 704(d)). The circuit court of Adams County sentenced defendant to a term of 10 years' imprisonment for the offense of unlawful possession of cocaine. The court also assessed a fine of $1,960, which is equivalent to the street value of the drugs found in defendant's possession, pursuant to section 5—9—1.1 of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—9—1.1), and a fine of $25, pursuant to section 10 of the Violent Crime Victims Assistance Act (Ill. Rev. Stat. 1987, ch. 70, par. 510). Defendant appeals. We affirm.

On appeal, defendant raises the following allegations of error: (1) the circuit court erred in denying defendant's motion to suppress evidence because the complaint for search warrant was insufficient to establish probable cause; (2) defendant was not proved guilty beyond a reasonable doubt, either as a principal or as one accountable for the principal's acts; (3) the court erred by refusing to admit into evidence an excerpt from a codefendant's sentencing hearing which defendant alleges is an admission of defendant's innocence by the State; (4) the court erred in admitting irrelevant and immaterial evidence concerning a currency exchange made by defendant 1½ months before his arrest; and (5) the court erred in requiring the jury to continue deliberating after it sent a note to the court stating it was deadlocked. In addition, the State argues defendant's sentencing was incomplete, as no sentence was imposed for unlawful possession of cannabis, and such a sentence in this cause would not violate *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.

Initially, we address the question pertaining to the motion to suppress evidence. On July 13, 1987, a search warrant was issued for the residence at 304 Elm Street, Quincy, Adams County, Illinois. The complaint for search warrant alleged the following facts as grounds for supporting charges of possession and delivery of cocaine:

"He [complainant] has been a law enforcement officer for 7 years and Dept. of Criminal Investigation (D.C.I.) Agent for 1½ years. On July 6, 1987, complainant met w/an individual re the purchase of cocaine. Said individual led complainant to above described residence. He gave said individual $220 to go into residence to purchase 2 grams of cocaine. He walked toward above described door and returned from area of said door approximately 10 minutes later, and handed complainant a folded piece of paper containing white powdery substance which field-tested positive for possible presence of cocaine. Within the past 24

hours, complainant met with same individual for the purchase of more cocaine. Said individual again led complainant to same above-described residence. Complainant gave individual $200 to take into residence to purchase 2 grams of cocaine. He went into residence through said door and he exited from the same door about 7 minutes later. After returning he gave complainant packet of white powdery substance, which again field-tested positive for the possible presence of cocaine. Complainant gave said individual pre-recorded U.S. currency. A copy of said currency is attached hereto as Exhibits A and B. On July 6, money given to said individual was U.S. currency in following denominations:

$20 bill G70943039A

$100 bill EO6165513B

$100 bill G30383915A."

The complaint was signed and sworn to by Kenneth Yelliot, a sergeant with the Department of Criminal Investigations. The search of the home was conducted on the evening of July 13, 1987. Defendant was present and was arrested as the house contained large quantities of cocaine and cannabis, as well as large sums of money.

On December 30, 1987, defendant filed a pretrial motion to suppress the evidence seized at 304 Elm Street in Quincy. The motion argued that the complaint for search warrant contained insufficient information to sustain the finding of probable cause. No allegation was made that defendant had a reasonable expectation of privacy for the place searched or the property seized. Following arguments, the court took the motion under advisement. Subsequently, an order was entered finding that defendant had no standing to contest the search of the premises and the seizure of the illegal drugs found therein because he had made no showing "that his fourth amendment rights were violated." The trial court also examined the sufficiency of the complaint. It determined that, viewed under a commonsense approach, the complaint contained sufficient facts to support a warrant, although the complaint may have been "inartfully drawn."

Defendant argues the complaint is insufficient for three reasons. He notes that the individual who led the police officer to 304 Elm Street for the controlled purchases was a convicted drug dealer himself, and was not searched prior to or after the purchases were allegedly made. Therefore, it is possible the individual never purchased the cocaine at 304 Elm Street but surreptitiously sold the cocaine to the police officer himself. Defendant notes the police officer did not even see the individual enter the residence during the first visit. Rather, the individual was merely seen near the entrance to 304 Elm Street. Sec-

ond, defendant questions the reliability of the field tests performed by the officer on the white, powdery substance. Defendant argues the officer failed to obtain verification that the substance was actually cocaine. Therefore, his statements regarding the presence of cocaine can only be described as conclusions. Finally, defendant argues there are no facts or statements in the complaint that directly suggest there would be more cocaine found at 304 Elm Street. The officer records no statement from the individual that he saw cocaine inside the home, nor, in fact, is it recorded that the individual even purchased the substance in the house. Defendant argues these thoughts are mere conclusions for the issuing magistrate to make based on assumptions and not facts. Therefore, defendant concludes the complaint was insufficient to support a finding of probable cause.

Defendant cites *People v. Grzeskiewicz* (1981), 94 Ill. App. 3d 769, 419 N.E.2d 56, for support. In *Grzeskiewicz*, a complaint for search warrant was made out for the search of a room in one of the buildings at Western Illinois University, and for the search of one Case R. Grzeskiewicz. The facts supporting the affidavit were as follows:

"On February 1, 1980, at approximately 9:30 a.m., Herbert Ross, an ordinary citizen and student at Western Illinois University, reported to affiant that he had observed Case R. Grzeskiewicz in Room 1312, Tanner Hall—Western Illinois University, Macomb, McDonough County, Illinois, on January 31, 1980, at approximately 7:30 p.m. and that Grzeskiewicz possessed a .38 caliber handgun while in said room. A records check with the office of Public Safety—W.I.U.—reveals that Grzeskiewicz had no permission to possess said weapon in Tanner Hall, said hall is supported in part with State of Illinois funds." (*Grzeskiewicz*, 94 Ill. App. 3d at 770-71, 419 N.E.2d at 57-58.)

The reviewing court determined the complaint was defective on its face. The informant's status was never verified. The affidavit furnished no information to the magistrate to verify that Herbert Ross was, indeed, a student at Western Illinois University. Second, there were no facts to explain how Ross had observed Grzeskiewicz, *e.g.*, as a visitor, or even as a burglar. Neither were there facts to explain Grzeskiewicz's relation to the room in which he was observed. Third, the complaint did not indicate how Ross knew Grzeskiewicz possessed a .38 caliber handgun. The complaint simply stated Ross's knowledge of the possession as a conclusion rather than a fact substantiating the conclusion. In sum, the facts stated were scant and the complaint based mainly on conclusions.

In response, the State asserts several reasons as to why the circuit court's decision should be upheld. The State contends defendant gave no basis for a privacy interest over the place searched or the property seized. His argument, therefore, should be dismissed because he did not show that his fourth amendment rights were violated. The State also argues the complaint was sufficient under the standard announced in *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, *rehearing denied* (1983), 463 U.S. 1237, 77 L. Ed. 2d 1453, 104 S. Ct. 33. Finally, if the complaint is found to be insufficient, the State argues this court should apply the "good-faith" exception to the exclusionary rule as discussed in *United States v. Leon* (1984), 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405.

■ The State's initial argument is correct. In a motion to suppress evidence illegally seized in violation of a defendant's fourth amendment rights, the defendant must first show he had a legitimate expectation of privacy in the areas searched. (*Rakas v. Illinois* (1978), 439 U.S. 128, 130-31 n.1, 58 L. Ed. 2d 387, 393 n.1, 99 S. Ct. 421, 424 n.1; *United States v. Salvucci* (1980), 448 U.S. 83, 85, 95, 65 L. Ed. 2d 619, 623, 630, 100 S. Ct. 2547, 2549, 2554-55; *Rawlings v. Kentucky* (1980), 448 U.S. 98, 104, 65 L. Ed. 2d 633, 641, 100 S. Ct. 2556, 2561.) Formerly, a defendant, who was accused of a crime in which possession was an element, was granted "automatic standing" to challenge a search or seizure allegedly made in violation of the defendant's fourth amendment rights. (*Jones v. United States* (1960), 362 U.S. 257, 263, 4 L. Ed. 2d 697, 703, 80 S. Ct. 725, 732.) That rule, as it pertains to possessory offenses, was expressly overruled in *Salvucci* (448 U.S. at 85, 95, 65 L. Ed. 2d at 623-24, 630, 100 S. Ct. at 2549, 2554-55).

■ ■ In a recent Illinois opinion, the court held a defendant who completely denies any interest in seized material does not have standing to argue suppression of the evidence. (*People v. Dowery* (1988), 174 Ill. App. 3d 239, 242, 528 N.E.2d 214, 216.) In *Dowery*, the defendant faced the apparent conflict of those charged with possession offenses. In order to show her fourth amendment rights were violated, she would have to admit possession of the contraband. Yet, one of her defenses appeared to be denial of possession. She chose to deny possession at the suppression hearing as well. On appeal, the court found her failure to establish a violation of her fourth amendment rights at the suppression hearing fatal. The court reasoned that the conflict no longer exists because the State cannot use a defendant's admissions from a suppression hearing at trial. (*Salvucci*, 448 U.S. at 93, 65 L. Ed. 2d at 629, 100 S. Ct. at 2553.) We find *Dowery* determinative of the issue in the instant case. Defendant made no showing that he had

an expectation of privacy in the residence at 304 Elm Street. Therefore, he cannot be heard to challenge the sufficiency of the warrant.

■ In any event, the complaint for warrant contains sufficient facts to support a finding that probable cause existed to believe illegal drugs could be found at the residence at 304 Elm Street. The standard for determining whether probable cause exists for the issuance of a search warrant is a totality of the circumstances approach:

> "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for *** conclud[ing]' that probable cause existed." (*Gates*, 462 U.S. at 238-39, 76 L. Ed. 2d at 548, 103 S. Ct. at 2332.)

The standard discussed in *Gates* was expressly adopted by our supreme court in *People v. Tisler* (1984), 103 Ill. 2d 226, 245-46, 469 N.E.2d 147, 157.

■ In the present case, it is clear the complaint alleged sufficient facts to conclude that cocaine could be found at the residence at 304 Elm Street. Two controlled purchases of cocaine were made within a seven-day period. On the first occasion, the affiant police officer was led by an individual to 304 Elm Street. The officer gave the individual prerecorded funds, and he approached the area of the front door to the house. The individual returned to the police officer several minutes later with a packet containing a white, powdery substance. The substance tested positive for cocaine under a field-analysis test. Seven days later, the process was repeated. This time, the officer could clearly see the individual enter the residence at 304 Elm Street. After seven minutes, the individual returned to the officer's car with another packet containing a white, powdery substance. The substance again tested positive for cocaine. Each controlled purchase was closely supervised by a police officer. The individual returned from the house to a waiting police officer on two occasions with a substance found likely to contain cocaine. The fact the warrant failed to expressly state that more cocaine could be had at the residence does not make it ineffective. The facts imply cocaine could be purchased at the home. Under a totality of the circumstances approach in which common sense may be employed to interpret the facts, probable cause existed for a search warrant to be issued for the residence at 304 Elm Street. Because of our holding here, we need not discuss the "good-faith" exception to

the exclusionary rule.

Defendant's next argument is that he was not proved guilty beyond a reasonable doubt. The jury was instructed concerning the charges brought against defendant. In addition, the jury was given the accountability instruction (Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981)) based on section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c)). Defendant argues the evidence does not show him guilty as a principal, or under accountability principles.

The evidence adduced at trial is as follows. The search of the residence at 304 Elm Street was conducted during the evening hours of July 13, 1987, following the issuance of the warrant. The warrant was executed by members of the West Central Illinois Task Force, a combination of several police agencies, including the Department of Criminal Investigation and the Adams County sheriff's department. At approximately 8 p.m., on July 13, Lee Mangold, an undercover agent with the task force, knocked on the front screened door at 304 Elm Street. The main door to the residence was open, and Mangold could see defendant lounging on an L-shaped couch, watching television. Defendant invited Mangold inside. Mangold asked defendant where Debbie was, indicating Debbie Dodd, the owner of the house at 304 Elm Street. Mangold stated he needed some "coke." Defendant told him that Dodd was in the kitchen. Mangold walked to the kitchen, handed Dodd a search warrant, and sent a radio transmission for his fellow officers to enter the house. Sheriff's deputies Russell Garrison and Ray Nebe came through the front door and guarded defendant and Dodd, the only two people in the house. Defendant remained seated with his left arm propped on the back of the couch, and his right hand jammed in the pocket of the short pants he was wearing. When Mangold asked defendant to stand up, Garrison saw defendant remove his hand from his pocket and drop a clear plastic baggie onto the couch. After defendant was handcuffed, Garrison picked up the baggie, which contained about one-quarter of an ounce of a greenish-brown leafy substance, as well as a hand-rolled cigarette. The leafy substance was subsequently identified as cannabis.

Defendant was transported to the Adams County jail. Dodd, who was in her ninth month of pregnancy, stayed in the house while the search was conducted and was later released on a notice to appear. Cocaine, cannabis, drug-related paraphernalia, and large sums of money were found in three areas of the house, the living room, the master bedroom, and the bathroom. In the living room, an ash tray, with a small amount of cannabis, and a porcelain bong, in which there

was burned debris, were sitting on a cocktail table approximately two feet from the couch where Morrison had been lounging. A brown billfold, which contained $43, and a "snow seal" filled with cocaine were found on the floor behind the couch in the approximate area where defendant's left hand had been perched on the back of the couch. There was no identification in the wallet. The only item found in the bathroom was a blue cocaine grinder, which was in the medicine cabinet above the sink.

The master bedroom, in which there was a queen- or king-size bed, was at the front side of the house, adjoining the living room. There were two dressers in the master bedroom. The dresser on the south side of the room was filled with men's clothing and undergarments; the dresser on the east side contained women's clothing. An O'Haus Double-Beam, Dial-A-Gram scale was sitting on top of the dresser which was filled with women's clothing. Inside that dresser was a certificate of title issued on June 12, 1987, from the Illinois Secretary of State to defendant for a Suzuki motorcycle. The purchase date was May 12, 1987, and defendant's address was stated as 304 Elm Street. A black Suzuki motorcycle was parked near the front of the house. A tan purse was sitting on a table north of the woman's dresser. Inside that purse was a plastic bottle which contained 21 snow seals filled with cocaine, a Royal Crown bag stuffed with $3,500 in $5, $10, and $20 bills, and a billfold. The billfold contained Dodd's driver's license and credit cards, and $553 in larger bills (five $100 bills, one $50 bill, and three $1 bills). An additional $117 was loose in the purse.

A cardboard battery charger box was sitting on top of the dresser filled with men's clothing. Inside the box were two clear baggies of cannabis, a clear bag which contained 70 empty snow seals, a smaller baggie of cocaine, and a bottle of inositol. Inositol is a vitamin supplement with the same physical characteristics as cocaine, and it is commonly used by drug dealers as an additive to the cocaine in order to increase profits.

The house appeared to have been recently decorated and was filled with new furniture and appliances. Mangold and a team of officers executed a second search warrant at the residence at 304 Elm Street on July 21, 1987, for the purpose of photographing the furnishings and seizing documentary evidence which would indicate who resided in the home. The officers found numerous receipts for recent cash purchases of merchandise in the residence. Most of the receipts were stashed in a white hutch in the master bedroom and in a metal box in one of the smaller bedrooms. There were nine receipts, contracts, and bills which were issued in defendant's name close in time to the July 13, 1987,

search of the premises. Seven of those items also bore the 304 Elm Street address. Those nine items were as follows: (1) a receipt from K's Merchandise Mart issued to defendant on July 10, 1987, for the cash purchase of a stereo, receiver, cassette deck, speakers, crib, dressing table, and jewelry box, for a total purchase price of $515.10; (2) a receipt from K's Merchandise Mart bearing the surname Morrison for the cash purchase of an entertainment center on July 11, 1987, in the amount of $389.94; (3) a cash receipt, dated July 8, 1987, bearing defendant's name and the Elm Street address, for the purchase of a motorcycle frame and parts costing $350; (4) a receipt from Sears, bearing defendant's name and the address at 304 Elm Street, for the cash purchase of a $169.99 rattan chair on July 2, 1987; (5) a receipt from Sears issued to defendant, with the 304 Elm Street address, on July 2, 1987, for the cash purchase of a carpet remnant costing $79.99; (6) a service contract between Sears and defendant and Debra Stapp of 304 Elm Street in Quincy, dated June 21, 1987; (7) a service contract between Sears and defendant, bearing the Elm Street address, dated June 7, 1987; (8) an invoice in the amount of $15 for repairs to a television, billed to defendant at 304 Elm Street in Quincy, and marked "paid" on July 10, 1987; and (9) a receipt for motorcycle parts totalling $261.85 and showing a deposit made of $82.35 by defendant on May 19, 1987, and a second date of July 15, 1987, when the remainder was paid. The grand total of the cash receipts in Morrison's name was $1,781.87.

Four cash receipts and one sales agreement were recovered bearing the name of Debra Stapp, Dodd's maiden name, or Debra Dodd, and the 304 Elm Street address. These were: (1) a sales contract, dated July 8, 1987, from K's Merchandise Mart for a full karat yellow-gold diamond ring valued at $1,350; (2) a receipt for a $689.50 sofa purchased on June 26, 1987; (3) a receipt, dated July 11, 1987, from Jerry's Wholesale for a nightstand and an armoire costing $1,241.20; (4) a receipt issued by Midwest Carpets on April 22, 1987, for the purchase of a carpet for $283.56; and (5) a receipt from Sears dated June 13, 1987, for a refrigerator purchased for $827.69. The grand total of the cash receipts in Dodd's name was $4,907.90. There was no name on another receipt from Jerry's Wholesale for the cash purchase of an oak table and four chairs for $515.95. Mangold located virtually all of the tangible items listed in the receipts in the residence at 304 Elm Street.

The police also seized a blue card issued by the Illinois Department of Public Aid to defendant, a public aid card issued to Debra Kay Dodd, an envelope containing food stamps, and a register for food

stamp collection showing the following dates: January 8, 1987, February 5, 1987, March 3, 1987, April 10, 1987, May 8, 1987, June 8, 1987, and July 6, 1987.

Michael Cravens, a forensic scientist with the Illinois State Police, testified that he tested all of the white powder recovered from the residence and established by chemical analysis that it was cocaine, except for the white powder in the bottle labeled inositol, which was, in fact, inositol. He also tested the greenish-brown vegetable substances found in the premises and determined by microscopic and chemical analysis that they were cannabis.

Over defense objection, Betty Dickson, a bank teller at the Boatman's Bank in Quincy, testified concerning a currency exchange made by defendant. Dickson usually worked at the drive-up windows. On May 26, 1987, defendant drove up to her window and asked to exchange $2,400 in $10 and $20 bills for twenty-four $100 bills. Dickson asked defendant if he was making this exchange for another person, and defendant answered, "Yes, for Karen Stapp." Dickson explained that Karen Stapp, Debra Dodd's sister, had an account at the bank and had made at least seven similar money exchanges in the past. Dickson made the currency exchange for defendant.

Sergeant Gerald Kempf, a drug enforcement agent with the Illinois State Police for 19 years and the director of the West Central Illinois Task Force, testified that he had several years of experience as an undercover buying agent for drug transactions. He stated that it was standard practice for drug dealers to purchase their supply with $100 bills. Kempf further testified that in July 1987, the street value of a gram of cocaine was $100, and an ounce of cannabis cost between $100 and $140.

Neal Baker, a detective with the Quincy police department, testified that on April 13, 1987, defendant summoned the police to 304 Elm Street. Baker was dispatched and met defendant at the house. Defendant wanted to charge Dodd with criminal damage to property. Defendant stated that he and Dodd had had a fight, that she had thrown his personal belongings out on the front porch, and that they had been damaged by the rain. Baker told defendant that there were no grounds for a criminal complaint because defendant and Dodd were living together. In response to Baker's inquiry, defendant stated that he and Dodd had lived together between 6½ and 8½ years. On cross-examination, Baker stated he also found defendant at a different address on one occasion. Following his arrest for an unrelated offense, defendant listed his address as 1801 16th Street on his bond form. In the late morning hours of April 28, 1987, Baker sought to confirm that ad-

dress, and he visited the mobile home at 1801 16th Street. Baker found defendant present. Defendant, however, stated that he had been in the house at 304 Elm Street earlier in the morning, looking for a pair of shoes. This concluded the State's case.

Defendant's mother, Janet Wamples, and Debra Dodd testified on defendant's behalf in an effort to convince the jury that the contraband belonged only to Dodd. Wamples testified that defendant came to live with her and her mother in a mobile home at 1801 North 16th Street in Quincy around the middle part of April 1987, and that he did not return to live with Dodd at 304 Elm Street until after his arrest for the instant offenses. Wamples stated defendant was unemployed, and she supported defendant with the salary and tips she earned as a waitress. She recalled that on July 13, 1987, she had prepared dinner for defendant at approximately 7:30 or 8 p.m. Shortly thereafter, defendant left the mobile home.

Dodd testified that she and defendant had lived together for intermittent periods of time over the last eight or nine years. Dodd was pregnant with defendant's child when the police raided the house on July 13. According to Dodd, defendant became a drug dealer "a long time ago" and was eventually convicted for selling cocaine. He was sentenced to the Department of Corrections for a five-year term of imprisonment. She gradually took over his drug business while he was incarcerated and made so much money that it was no longer necessary for her to work as a bartender. When defendant returned from prison and resumed living with her, she sought to keep her drug business a secret by limiting the number of sales from the house and moving her supply of drugs and money out of the house. Although neither of them was employed, defendant did not bother to ask her how she managed to pay the mortgage on the house, the taxes, and the utilities, all of which were in her name.

Dodd testified that she threw defendant and all of his belongings out of the house on April 13, 1987, after catching him with another woman. He did not return to live with her until August 11, 1987, when their son was born. Once defendant was gone, Dodd decided to remodel the house with all the money she had saved from selling drugs. Although she paid cash for all labor and merchandise, she had defendant's name placed on many of the receipts and contracts so the Department of Public Aid would think he was the source of those assets. However, on cross-examination, she admitted that she told the probation officer who compiled her presentence report that defendant had purchased the household items with money that he made from various jobs and from money that he had borrowed from a friend. She stated

defendant did not actually make the purchases, but he often helped her transport the merchandise to the house, if it was too heavy for her to carry. Dodd claimed that she purchased a new motorcycle frame and parts after she ran over defendant's motorcycle with her automobile.

After Dodd threw defendant out, he made several attempts to restore their relationship. He would occasionally visit her and do odd jobs around the house. Dodd explained that she had invited defendant to dinner on the night the house was raided. She stated defendant had just arrived when the police came. Had the police arrived 15 minutes earlier, they would not have found defendant there. Dodd stated that all of the drugs and drug paraphernalia in the house belonged to her, and that she had just received a large shipment of cocaine several hours before the police arrived. As far as she knew, defendant was unaware that illegal drugs were in the house. She also said that the men's clothing in the dresser in the master bedroom belonged to her brother David, who lived with her from time to time. She stated that the man's wallet and the baggie of cannabis found in the living room might have belonged to her brother David. Finally, Dodd told the jury about the negotiated plea arrangement she had made with the State. She pleaded guilty to the lesser offense of unlawful possession of more than 1 gram but less than 15 grams of cocaine, with intent to deliver. (See Ill. Rev. Stat. 1987, ch. 56½, par. 1401(b).) In return, the State dismissed the cannabis charge and agreed to a maximum limit of seven years' imprisonment in the Department of Corrections. Dodd was sentenced to a term of five years' imprisonment.

Originally, both defendant and Dodd had been charged with unlawful possession of more than 15 grams of cocaine, with intent to deliver, in violation of section 401(a)(2) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2)), and unlawful possession of more than 30 grams but less than 500 grams of cannabis, with intent to deliver, in violation of section 5(d) of the Cannabis Control Act (Ill. Rev. Stat. 1987, ch. 56½, par. 705(d)). Dodd pleaded guilty to a lesser charge, as above stated. The jury acquitted defendant of the charge of possession, with intent to deliver, but found him guilty of unlawful possession of more than 15 grams of a substance containing cocaine and possession of more than 30 grams but less than 500 grams of a substance containing cannabis. His sentence included fines and a 10-year term of imprisonment in the Department of Corrections.

Defendant argues the evidence was insufficient to establish his possession of the illegal drugs or his accountability for Dodd's guilt of possessing the drugs. Defendant maintains the trial court erred in instructing the jury on accountability principles.

In order to establish defendant's guilt of the possession offenses, as a principal, the State had to prove defendant's knowledge of the presence of the narcotics and his immediate and exclusive control over them. (*People v. Gant* (1986), 150 Ill. App. 3d 180, 187, 501 N.E.2d 355, 361, *cert. denied* (1987), 484 U.S. 843, 98 L. Ed. 2d 91, 108 S. Ct. 134; *People v. Valentin* (1985), 135 Ill. App. 3d 22, 31, 480 N.E.2d 1351, 1358.) Possession can be actual or constructive. (*Valentin*, 135 Ill. App. 3d at 31, 480 N.E.2d at 1358.) Actual possession is proved by evidence which shows defendant exercised some form of dominion over the unlawful substance, such as trying to conceal it or throw it away. (*People v. Howard* (1975), 29 Ill. App. 3d 387, 388-89, 330 N.E.2d 262, 264.) Constructive possession exists where there is no actual personal present dominion over the narcotics, but there is an intent and a capability to maintain control and dominion over them. (*Valentin*, 135 Ill. App. 3d at 31, 480 N.E.2d at 1358.) Constructive possession may be proved by showing defendant controlled the premises where the narcotics were found. (*People v. Rush-Bey* (1987), 152 Ill. App. 3d 17, 22, 503 N.E.2d 1193, 1196; *Gant*, 150 Ill. App. 3d at 187, 501 N.E.2d at 361.) The required element of exclusive possession may be established even when possession is joint. *People v. O'Neal* (1985), 139 Ill. App. 3d 791, 795, 488 N.E.2d 277, 280; *People v. Burke* (1985), 136 Ill. App. 3d 593, 599, 483 N.E.2d 674, 679.

Defendant argues the evidence was insufficient to prove he had any relationship to Dodd's home at 304 Elm Street except that of an invited guest present for dinner. Defendant points to the fact that the home was owned by Dodd alone. All the utilities were in Dodd's name. Defendant's mother, Janet Wamples, testified that defendant was living at her mobile home on July 13, 1987, and that he had been there since approximately April 13. At that time, he had moved back from Dodd's home. Defendant argues the testimony of Officer Baker supports the testimony of Wamples. Baker arrived at Wamples's mobile home one morning and found defendant present. Baker's purpose was to verify defendant's address as that of the mobile home at 1801 North 16th Street. Based on these facts, defendant argues the evidence conclusively proves he did not reside at 304 Elm Street and, therefore, had no possessory interest in the items seized at the home. Defendant further states that since he was not a resident of Dodd's home, he did not exercise control over the illegal substances found in the residence.

We disagree with defendant's conclusions. Defendant clearly has ignored the majority of the evidence produced by the State. The State's evidence is circumstantial but, nevertheless, pointed to defendant's residence at 304 Elm Street. Dodd admitted that defendant had

lived off and on with her for several years. In fact, Dodd was 8½ months pregnant with defendant's child at the time her home was raided.

Defendant was the one who invited Mangold into the premises on July 13 and directed Mangold to Dodd after Mangold stated that he wanted to buy cocaine. When defendant learned that Mangold was an undercover agent, he attempted to discard the one-quarter ounce of cannabis that was in his pocket and his billfold containing a snow seal filled with cocaine. Although there was no identification in the wallet, the jury could infer from the evidence that it belonged to defendant and that he dropped it surreptitiously behind the couch. An open tray of cannabis and a porcelain bong were sitting on a cocktail table approximately two feet from where defendant was seated. The largest share of drugs was found in a battery charger box sitting on top of a dresser filled with men's clothing. The jury could infer possession of the clothing to defendant. There were a number of defendant's personal papers found in the master bedroom and in one of the smaller bedrooms. There were no less than seven receipts, contracts, and bills which bore defendant's name, the 304 Elm Street address, and dates in close proximity to the July 13 search. The receipts were for furnishings and other items the police located in the residence. Inside the dresser on which the scale was sitting lay a vehicle registration for defendant's Suzuki motorcycle. The registration was addressed to defendant at 304 Elm Street, and it showed the motorcycle was purchased and the registration issued after the rift allegedly occurred between defendant and Dodd. Further, defendant made a money exchange at a bank on May 26, 1987, acquiring the denomination of currency drug dealers prefer when purchasing a supply of drugs. Considering this evidence, and all reasonable inferences drawn from it, a rational trier of fact could find beyond a reasonable doubt that defendant resided at 304 Elm Street with Dodd, had constructive possession of the large quantity of drugs in the master bedroom, and had factual or constructive possession of the one-quarter ounce baggie of cannabis and the single snow seal found in the man's wallet.

■■ Defendant's mother and Dodd attempted to persuade the jury that defendant lived elsewhere and that the contraband belonged only to Dodd. However, the jury need not have accepted their testimony as true. It is the function of the jury to determine the credibility of the witnesses and the weight to be afforded their testimony. As such, they may reject the explanations by which the defendant attempts to place himself beyond knowledge and possession of the contraband. (*Burke*, 136 Ill. App. 3d at 600, 483 N.E.2d at 679.) The evi-

dence sufficed to establish defendant's guilt of the possession offenses as a principal. For this reason, we need not address the argument pertaining to defendant's guilt under accountability principles. Any possible error in giving an unsupported accountability instruction was harmless given the proof of defendant's guilt as a principal. See *People v. Finch* (1946), 394 Ill. 183, 191, 68 N.E.2d 283, 286-87, *cert. denied* (1946), 329 U.S. 786, 91 L. Ed. 673, 67 S. Ct. 298.

Defendant's third issue concerns an alleged admission by the State that defendant was innocent of the charges filed against him. At defendant's jury trial, defendant asked the court to take judicial notice of an excerpt from codefendant Dodd's sentencing hearing which contained the alleged admission, and then to be allowed to read the excerpt to the jury as substantive evidence of defendant's innocence. The court determined the statements were not admissions and refused to allow them into evidence. The excerpt, taken from the prosecutor's closing argument, is as follows:

" 'Your Honor, it doesn't happen very often that the police finally get, they get the Michael Pleasants, but once in a while, you land a big fish, you find a major player; and in this instance, we have got one.

It is not one of those cases where she lays it on somebody else. We have had other women before this Court who have had children, who have gotten probation; and in each of those instances, it has been where the male in the house has been someone who is more or less the mover, the one who has more or less forced them into this trade.

We don't have that here. *We have no hint of that here; and there is no testimony at all to lay this on Ricky Morrison.* So, we are looking at, at, in this case, Mrs. Big. Maybe Ricky will get his. We certainly hope so. But certainly she has not argued and cannot argue that she was, there was some compulsion from someone else to do this.' " (Emphasis added.)

Defendant argues the emphasized portion of the quote constitutes an admission of defendant's innocence by the State in the same proceeding. Defendant argues that since both defendants were originally charged in the same cause, the proceedings involving both are in actuality the same proceeding. Therefore, continues defendant, the excerpt should have been given to the jury for its consideration.

The State responds by interpreting the excerpt from the prosecutor's closing argument as comments directed to the strength of the State's case against Dodd, with little relevance to defendant's case. We agree. What does or does not constitute an admission is a

matter of case-by-case analysis. (*Schall v. Forrest* (1977), 51 Ill. App. 3d 613, 615, 366 N.E.2d 1111, 1113.) The excerpt quoted above cannot be justly construed as an admission on the part of the State that defendant was really innocent. It is simply not a clear admission against interest. Its focus is to the guilt of Dodd and, at best, its relevance to defendant is ambiguous. We find no error in refusing to allow its admission into evidence.

Defendant's fourth question on appeal relates to the testimony of Betty Dickson, the bank teller. She testified regarding a bank transaction defendant made on May 26, 1987. Defendant transferred $2,400 in small denominations to twenty-four $100 bills. Defendant stated he was making the transaction on behalf of Dodd's sister, who had an account with the bank. Later, Sergeant Kempf testified that he had experience through undercover police work in making drug transactions with drug dealers. Kempf stated that dealers preferred to use $100 bills when purchasing their supply of drugs. Following defendant's arrest on July 13, defendant filed several motions. Among the motions was a bill of particulars which asked for details relating to the date, time, and place of the charges filed against defendant. Although Dickson was disclosed as a witness for the State in timely fashion, the bank transaction was not included in the State's response to the bill of particulars. Defendant argues Dickson's testimony was irrelevant to the charges brought against defendant. Also, defendant argues the testimony about a bank transaction which occurred on May 26 is in violation of the State's response to the bill of particulars stating only July 13 as the date of the violation.

Defendant's interpretation of the purpose of a bill of particulars is incorrect. The purpose of a bill of particulars is to supplement an indictment so as to better inform the defendant of the nature of the charges against him, or to better enable him to present a defense. (*People v. Noll* (1982), 109 Ill. App. 3d 306, 308, 440 N.E.2d 335, 337.) It also serves to limit the evidence which may be introduced by the State. (*Noll*, 109 Ill. App. 3d at 308, 440 N.E.2d at 337.) However, this limitation merely confines the State to evidence supporting the transaction set forth in the bill. It does not require the State to specify in the bill all the evidence it will produce in support of the charges. (*People v. Bain* (1935), 359 Ill. 455, 472, 195 N.E. 42, 50.) Therefore, whether Dickson's testimony was properly admitted against defendant depends on whether it is material and relevant to proving defendant had possession of illegal narcotics on the night of July 13 with the intention of selling them.

The evidence tended to support the fact that defendant was in-

volved in the narcotics trade on the evening of July 13. Defendant's involvement in the bank transaction, in which a large amount of cash was changed into denominations favored by drug dealers, implied defendant's knowledge of the large amounts of cash being processed through the house at 304 Elm Street. A substantial sum of cash was found at the home on July 13. Dickson's testimony was relevant as circumstantial evidence of defendant's current participation with Dodd in the drug trade.

Defendant's final contention is that the trial court erred in requiring the jury to continue deliberating after it had indicated it was deadlocked. Following lunch on the third day of trial, the jury heard closing arguments and received instructions. A period of deliberation ensued. Thereafter, the jury sent the court a note requesting a clarification of where certain evidence was found. The court conferred with counsel and drafted a short note in response. Following another period of deliberation, the jury sent a second note stating: "We cannot all agree 100% either way." The court again conferred with counsel and then brought the jury back into open court. The court questioned the jury regarding the numerical split of the vote and also ascertained that it had been that way for quite some time. The foreman seemed to think the jury was hopelessly deadlocked. The court and counsel retreated into chambers to discuss the matter. The following colloquy occurred:

"MR. SCHNACK [Defense Counsel]: Could you ask this jury the question: Can you give us a verdict as to either the cocaine-related charge or the Cannabis-related charge without stating which one?

MR. WALDEN: And perhaps, have you been voting as to each?

THE COURT: Okay. I will ask if they could reach a verdict as to the cocaine charge or the Cannabis charge.

(The following proceedings were had in the presence and hearing of the jury.)

THE COURT: Mr. Foreman, would you stand again please.

Mr. Foreman, I would like you to listen to this question which is: Can you give us a verdict—can the jury give us a verdict as to the cocaine charge or the Cannabis charge? Can you give us a verdict as to the cocaine charge or the Cannabis charge?

FOREMAN: Sir, if anything, possibly the Cannabis, and when I say possibly, I would like to elaborate, but I don't know the law that well.

THE COURT: Well, you really shouldn't elaborate. I don't

want to know what's going on in there. I don't want to know that.

FOREMAN: Okay. But, if anything, it would be—the closest would be the Cannabis, and to what degree I shouldn't say; am I correct?

THE COURT: All right. I think, gentlemen, I will have the jury return to the jury room, and I will instruct you to continue to deliberate, and we will see what develops out of your deliberations.

So, you may return to the jury room and deliberate."

The jury reached a verdict following further deliberation. There was no indication about the time frame in which these discussions occurred except that at one point, the court stated to the foreman:

"You haven't been negotiating or discussing this case for any real great length of time. You have been out a total of three hours, and you ate during that period of time. So, you haven't been out too long for this kind of a case."

Defendant argues the court erred in requiring the jury to continue deliberating. Defendant argues the court forced the jury to reach a compromise verdict because the final period of deliberation stretched through the dinner hour and the court had not indicated to the jurors that they would be fed.

■■■ We find no abuse of discretion under the circumstances presented in this case. The trial court has discretion to have the jury continue its deliberation, even though the jury has reported that it is deadlocked and will be unable to reach a verdict. (*People v. Cowan* (1985), 105 Ill. 2d 324, 328, 473 N.E.2d 1307, 1309.) Moreover, the fact that the court did not give the supplemental instruction from *People v. Prim* (1972), 53 Ill. 2d 62, 75-76, 289 N.E.2d 601, 609, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731, does not mandate a finding of error. The time when a supplemental instruction should be given is for the court to decide. (*Cowan*, 105 Ill. 2d at 328, 473 N.E.2d at 1309.) The record indicates that shortly before deliberations began, the jury had been fed lunch. The jury then deliberated for three hours before sending the note stating it was deadlocked. Following discussion with counsel, the court asked whether the jury could come to a verdict on one of the charges. The foreman responded that it might be possible, and the court sent the jury back for further deliberations. The court's instruction was not coercive but designed to guide the jury in its handling of a difficult criminal case. We find no error in not mentioning to the jury that they would be fed at an appropriate time.

■■■ Finally, the State argues defendant should have received a sentence for the cannabis conviction, as well as the cocaine conviction. Possession of cannabis is an offense with at least one element that is different than possession of cocaine. Therefore, possession of cannabis is not an included offense of possession of cocaine and, under *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 845, a concurrent sentence for possession of cannabis would be proper. Our supreme court recently reviewed *King*, and its progeny. The court summarized the current state of the law as follows:

> " '[I]f a defendant commits more than one criminal act in an episode or transaction, he may be prosecuted for more than one offense unless the charges involve precisely the same physical act. If the physical acts are distinct, the defendant can be convicted of both, but only concurrent sentences can be imposed. If exactly the same physical act does form the basis for more than one offense, a defendant may still be prosecuted for each offense, but only one conviction and sentence may be imposed.' " (*People v. Segara* (1988), 126 Ill. 2d 70, 77, quoting Eisenberg, *Multiple Punishments for the "Same Offense" in Illinois*, 11 S. Ill. U. L.J. 217, 236-37 (1987).)

In the instant case, we deal with two distinct physical acts stemming from the same "episode." Possession of cannabis and possession of cocaine necessarily involve separate physical acts. Therefore, under our supreme court's most recent discussion of the principle of one conviction for one act, defendant should have been sentenced to a concurrent term of imprisonment for possession of cannabis. Sentencing is a necessary component of a judgment of conviction. (*Segara* (1988), 126 Ill. 2d at 78.) We, therefore, order this cause remanded for a further sentencing on the offense of unlawful possession of more than 30 grams but less than 500 grams of cannabis. Ill. Rev. Stat. 1987, ch. 56½, par. 704(d).

For the reasons stated above, the judgment of the circuit court of Adams County is affirmed, and the cause is remanded for the limited purpose of sentencing defendant on the cannabis conviction.

Affirmed and remanded.

SPITZ and GREEN, JJ., concur.